07 CIV 8206

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

JUDGE PRESKA

| | | |
|---|---|---|
| Donald Smith, On Behalf of Plaintiff and All Others Similarly Situated, | § | Civil Action No. |
| | § | |
| Plaintiff, | § | |
| | § | |
| vs. | § | |
| | § | |
| THORNBURG MORTGAGE, INC., GARRETT THORNBURG, LARRY A. GOLDSTONE, CLARENCE G. SIMMONS, AND, JOSEPH H. BADAL, | § | |
| | § | **JURY TRIAL DEMANDED** |
| | § | |
| Defendants. | § | |

SEP 20 2007
U.S.D.C. S.D. N.Y.
CASHIERS

**CLASS ACTION COMPLAINT FOR VIOLATIONS
OF FEDERAL SECURITIES LAWS**

Plaintiff, individually and on behalf of all other persons similarly situated, by Plaintiff's undersigned attorneys for Plaintiff's complaint against Defendants, alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and upon information and belief as to all other matters, based on, inter alia, the investigation conducted by and through Plaintiff's attorneys, which included, amongst other things, a review of the Defendants' press releases, Securities and Exchange Commission ("SEC") filings by Thornburg Mortgage, Inc. ("Thornburg Mortgage" or the "Company") and media reports about the Company. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE CASE

1.    This is a securities class action on behalf of Plaintiff and all other persons or entities, except for Defendants, who purchased or otherwise acquired the securities of Thornburg Mortgage, Inc. (the "Class") during the period April 19, 2007 and through August 14, 2007, inclusive (the "Class Period"), seeking to pursue remedies under the Securities Exchange Act of 1934 (the "Exchange Act").

## JURISDICTION AND VENUE

2.    Jurisdiction is conferred by §27 of the Exchange Act. The claims asserted herein arise under §§10(b) and 20(a) of the 1934 Act and Rule 10b-5. This Court has jurisdiction over the subject matter of this action under 28 U.S.C. §§1331 and 1337, and §27 of the 1934 Act.

3.    Venue is proper in this District pursuant to §27 of the 1934 Act and 28 U.S.C. §1391(b). Many of the acts and transactions alleged herein, including dissemination of materially false and misleading information, occurred in substantial part in this District.

4.      In connection with the acts and conduct alleged herein, Defendants, directly and indirectly, used the means and instrumentalities of interstate commerce, including the United States mails and the facilities of the national securities exchanges.

## PARTIES

5.      Plaintiff Donald Smith purchased shares of Thornburg Mortgage stock at artificially inflated prices during the Class Period. As set forth in the accompanying certification, which is incorporated herein by reference herein, Plaintiff was damaged as undisclosed facts became known, and the artificial inflation was removed from the stock price,

6.      Defendant Thornburg Mortgage, Inc. operates as a single-family residential mortgage lending company. It originates, acquires, and retains investments in adjustable and variable rate mortgage (ARM) assets. Its ARM assets are comprised of purchased ARM assets and ARM loans, including traditional ARM assets and hybrid ARM assets. Thornburg Mortgage, Inc. acquires and originates assets through correspondent lending, wholesale lending, direct retail lending, and bulk acquisition programs from investment banking firms, broker-dealers, mortgage bankers, mortgage brokerage firms, banks, savings and loan institutions, credit unions, home builders, and other entities involved in originating, securitizing, packaging, and selling mortgage-backed securities and mortgage loans. Thornburg Mortgage is a Maryland corporation, with its principal place of business located at 150 Washington Avenue Suite 302, Santa Fe, NM 87501. Thornburg Mortgage trades on the New York Stock Exchange under the ticker symbol "TMA."

7.      Defendant Garrett Thornburg ("G. Thornburg") is Chairman of the Board and CEO of Thornburg Mortgage.

8.      Defendant Larry A. Goldstone ("Goldstone") was President, Chief Operating Officer and a director of Thornburg Mortgage.

- 3 -

9.    Defendant Clarence G. Simmons ("Simmons") was Senior Executive Vice President and Chief Financial Officer of Thornburg Mortgage.

10.    Defendant Joseph H. Badal ("Badal") was Executive Vice President and a director of Thornburg Mortgage.

11.    The individuals named as Defendants in ¶¶7-10 are referred to herein as the "Individual Defendants." The Individual Defendants, because of their positions with the Company, possessed the power and authority to control the contents of Thornburg Mortgage quarterly reports, press releases and presentations to securities analysts, money and portfolio managers and institutional investors, *i.e.*, the market. Each Individual Defendant was provided with copies of the Company's reports and press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.

12.    Because of their positions and access to material non-public information available to them but not to the public, each of these Defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public, and that the positive representations which were being made were accordingly materially false and misleading. The Individual Defendants are liable for the false statements pleaded herein, as those statements were each "group-published" information, the result of the collective actions of the Individual Defendants.

## SCIENTER ALLEGATIONS

13.    In addition to the above-described involvement, each Individual Defendant had knowledge of Thornburg Mortgage problems. Defendant Simmons, as CFO, through conference calls and other Company communications, reported the Company's financial results to stock analysts, investors and the market. Communications with the market, as well as internal reports showing Thornburg Mortgage forecasted and actual growth were prepared under the Individual Defendants' direction. Defendant G.

- 4 -

Thornburg, as Chairman of the Board and CEO, along with defendant officers Goldstone and Badal, necessarily knew and falsely communicated the Company's performance and prospects to analysts. These false and misleading communications included those made in the Company's SEC filings, conference calls with stock analysts, reports on Company operations and financing and press releases issued by the Company. Each Individual Defendant sought to demonstrate that he/she could lead the Company successfully and generate the growth expected by the market.

## SUBSTANTIVE ALLEGATIONS

14.    As early as January 23, 2007, the Company reported that the overall quality of its mortgage-backed securities "remained exceptional." In the Company's January 23, 2007 press release, Defendant Goldstone touted the favorable characteristics of the Company's mortgage loan origination activities to the investment community. The press release stated in part:

> *Our proven and efficient operating model, disciplined interest rate risk management practices and strong capital position provided the foundation for another successful year at Thornburg Mortgage.* By successfully executing a number of financing and alternative capital raising transactions, we strengthened our balance sheet and sustained our earnings in an environment where our core spread-lending business was impacted by competitive market and interest rate pressures. The completion of collateralized debt obligation (CDO) financings, the issuance of common and preferred stock, and junior subordinated debt, as well as the deployment of some of our excess liquidity, contributed to balance sheet growth and earnings performance during the year.

> We were very active in the CDO market in 2006 having completed seven CDO transactions through which we permanently financed $11.3 billion of ARM loans, including a $1.3 billion transaction in the fourth quarter. Because less equity capital is required for these transactions, we can more effectively leverage our existing capital base, creating balance sheet and earnings growth. Collectively, these transactions freed up an estimated $793.3 million of capital, which allowed us to acquire approximately $8.8 billion in additional ARM assets during the year. At December 31, 2006, our CDO financings had reached $18.7 billion, or 38% of our balance sheet financing, which we expect will continue to contribute to our profitability in future quarters.

***

Adding to our positive outlook is the anticipated earnings benefit we should realize as the interest rates on approximately $7.2 billion of our hybrid ARMS will reset over the next 24 months from an average interest rate of 4.63% to a current market rate. *This repricing, when combined with our expectation that prepayment speeds will remain relatively stable, gives us confidence that our earnings expectation in 2007 will likely be at the high end of the range of the current analysts' estimates* as polled by First Call, which are between $2.00 and $2.40 per share, and will likely exceed the current average estimate for 2008 of $2.37 per share.

***

15.    Adding to these positive assurances of safety and growth in the January 23, 2007 press release, Defendant Badal told the investment community that Thornburg Mortgage would experience as much as a 21% increase in its origination of mortgage loans, *even in light of a predicted decline in mortgage originations nationwide,* given the Company's unique business model and focus on "affluent borrowers with superior credit." Defendant Badal stated in part:

> *While the MBA is projecting a 5% decline in total mortgage originations in 2007,* we anticipate that our unique approach to loan originations - with our focus on providing jumbo and super jumbo ARM loans to affluent borrowers with superior credit directly and through our lending partners - will allow us to continue to gain market share. In 2007, we anticipate that our innovative lending activities will not only allow us to expand and enhance our lending partner network, but also build and retain long-term relationships with our current client base. *Our goal is to originate $6.8 billion in mortgage loans in 2007, a 21% increase over 2006.*

***

16.    On April 19, 2007, at the beginning of the Class Period, the Company issued a press release entitled, "Thornburg Mortgage Reports 1Q EPS of $0.62 -- Declares $0.68 1Q Dividend - Company's Disciplined and Efficient Strategies Result in Solid First Quarter Results; Industry Subprime Problems Improve Opportunities -- Quarterly dividend maintained at $0.68 -- Margins stabilizing as returns on new investment opportunities improve -- 1Q mortgage originations of $1.7 billion, up 20%

- 6 -

year-over-year -- Total assets of $55.2 billion; a 20% increase over prior year -- Continued exceptional credit performance with no losses and 0.11% 60-plus day delinquencies and REO." The press release, in which defendants again emphasized the Company's allegedly rosy outlook, stated in part:

> Thornburg Mortgage, Inc. (NYSE: TMA) reported net income before preferred stock dividends for the quarter ended March 31, 2007, of $75.0 million, or $0.62 per common share, as compared to $72.4 million, or $0.66 per common share for the prior year. Taxable earnings for the quarter are estimated to be $0.64 per common share.

> Simultaneous with the earnings announcement, the company's Board of Directors declared a first quarter dividend of $0.68 per common share, payable on May 15, 2007, to shareholders of record on May 4, 2007. The ex-dividend date is May 2, 2007. This dividend is unchanged from both the year-earlier period and the fourth quarter of 2006.

> *Garrett Thornburg,* the Company's chairman and chief executive officer, remarked, "The year 2007 is off to a better start than we had anticipated. Our disciplined approach to interest rate and credit risk management continues to allow us to report earnings above consensus earnings estimates. *We anticipate that we will further benefit from the troubles in the mortgage lending industry as credit standards tighten and investment returns on new mortgage assets improve.* As a result, our first quarter earnings were solid and we sustained the dividend. And, as we look ahead we are increasingly confident that we may not need to make a downward adjustment in the current dividend rate in 2007. After payment of the first quarter dividend, we will have an estimated $0.11 per share of undistributed taxable income to support future quarterly dividends."

> ***

> Mr. Goldstone continued, "In the first quarter, we benefited from wider spreads on new prime quality mortgage assets caused by credit concerns concentrated in the subprime and Alt A segments of the mortgage market, and also from reduced premium amortization as the current interest rate environment led to continued slower-than-projected prepayments. Premium amortization in the first quarter was $7.9 million, down 62% from $20.7 million in the first quarter of 2006. Going forward, and based on the current level of prepayment rates, yield curve shape and the improved market for new ARM assets, our portfolio margin and earnings should continue to benefit from better spreads and reduced premium amortization. *As a result, our outlook for 2007 and 2008 continues to improve."*

> *Mr. Goldstone* concluded, "Adding to our positive outlook is the anticipated earnings benefit we should realize as the interest rates on

approximately $6.7 billion of our hybrid ARMs contractually reset over the next 21 months from an average interest rate of 4.63% to a current market rate. As these seasoned hybrid ARM assets either reprice, refinance or pay off, our earnings will improve as we are funding many of these assets at negative portfolio margins today. Taking all of these factors together, *we are increasingly confident that our earnings expectation in 2007 will exceed the high end of the range of the analysts' current estimates as polled by First Call, which are between $2.25 and $2.40 per share, and appears likely to exceed the current dividend level in 2008."*

* * *

*Mr. Badal* added, "While the MBA is projecting a 9% decline in total mortgage originations in 2007, we anticipate that our service oriented, common-sense approach to loan underwriting - with our focus on providing jumbo and super-jumbo ARM loans to borrowers with superior credit will allow us to continue to gain market share. Further, recent credit problems in the mortgage lending industry are resulting in tighter credit lending practices industry-wide, which we believe will improve our relative competitive position as we sustain our high-level standards while most other lenders have to tighten their standards. In 2007, we anticipate that our innovative lending activities and improved competitive position will allow us to expand our lending partner network and grow our client base. *Our goal is to originate $6.8 billion in mortgage loans in 2007, a 21% increase over 2006."*

Mr. Badal explained, "During the quarter, our correspondent lending partners grew by 6% to 298 relationships. For loans originated in the quarter our average correspondent loan size was over five times the national average in the first quarter of 2007 or $984,188, up 20% from year end 2006. Based on the latest mortgage origination statistics, we are the nation's 21st largest correspondent lender."

Mr. Badal continued, "Our recently launched wholesale channel continues to gain momentum owing to our ability to provide innovative products and exceptional service to the mortgage broker community. We now have twenty account executives in five targeted geographic regions supporting 411 brokerage firms with 3,862 loan officer relationships. We continue to believe this channel will provide a growing source of higher yielding loans and new customer relationships. In 2007, we anticipate that 25% of our loan origination activity will be generated by this channel."

Mr. Badal concluded, "We have also seen positive results with our retention and referral programs. Not only has our client base grown 29% over the last year - we now service $12.9 billion of loans for 21,273 customers nationwide - but our Thornburg Mortgage Exchange Program(SM) and Refuse to Lose(SM) campaign have had a positive impact on our direct retail production and retention of current customers. These proactive campaigns target our clients who are likely to enter into another mortgage transaction and offer convenient mortgage options to allow us to retain and grow our relationships with them. In the first quarter, we exchanged $175.1 million of loans, thereby continuing our lending relationship with 274 of our current customers."

- 8 -

*The credit quality of the company's originated and bulk purchased loans remains exceptional and shows no signs of deteriorating.* At March 31, 2007, the company's 60-plus delinquent loans and real-estate owned properties were 0.11% of its $24.1 billion portfolio of securitized and unsecuritized loans, unchanged from December 31, 2006, and still significantly below the comparable industry conventional prime ARM loan delinquency ratio of 2.14%. At March 31, 2007, the allowance for loan losses totaled $14.8 million, or 53.9% of seriously delinquent loans, which management believes is an appropriate allowance level given the characteristics of the company's loan portfolio. The company did not realize a loan loss during the first quarter.

\* \* \*

*Clarence Simmons,* senior executive vice president and chief financial officer, commented, "Our earnings benefited from two additional factors in the first quarter. First, we sold $1.3 billion of higher premium adjustable-rate mortgage-backed securities for a gain of $1.8 million. Additionally, strong loan origination activity resulted in a $6.7 million market value gain on our pipeline of mortgage loan commitments and offsetting pipeline hedging transactions due to the effective management of our mortgage loan pipeline."

Mr. Simmons continued, "We continue to manage our portfolio in order to protect ourselves from a possible resumption of short-term rate increases by the Federal Reserve or a rise in longer term interest rates should the yield curve steepen. Accordingly, the addition of $6.5 billion of net new swap agreements, a $2.8 billion reduction of forward starting swap agreements, and the sale of $1.3 billion of ARM assets adjusted our portfolio duration at quarter end to negative two months from zero at December 31, 2006."

Mr. Simmons concluded, "During the quarter, we acquired or originated $5.6 billion of new mortgage assets and generated $2.1 billion of net portfolio growth, ending the quarter with consolidated assets of $55.2 billion. At quarter end, the unamortized cost basis at which we held our ARM assets was 100.7%, unchanged from the prior quarter, and still favorably positioning our asset portfolio should refinance activity pick up."

The company remains committed to preserving strong asset quality. At March 31, 2007, ARM assets rated "AAA" or "AA" comprised 95.3% of the ARM portfolio. AAA- and AA-rated purchased ARM securities represented 42.3% of ARM assets. Another 41.2% represented "A quality" loans that the company has securitized into AAA- or AA-rated securities. Purchased securitized loans, which represent securities where the company has purchased 100% of the securitized mortgage loans from other sellers, comprised 11.8% of ARM assets. The company has retained the credit risk associated with the ownership of these purchased securitized loans and has an allowance for loan losses in the form of a non-accretable discount of $15.1 million, or 0.23% of the balance of these securities.

\* \* \*

- 9 -

17. As a result of the April 19, 2007 press release, the price of Thornburg Mortgage stock rose 4%, closing on April 20, 2007 at $27.91 per share. In the following days, the stock continued to rapidly climb in value, closing at a price of $28.05 per share on April 23, 2007, on heavy trading volume.

18. On May 9, 2007, defendants issued SEC Form 10-Q for the quarter ended March 31, 2007, which included the previously reported financial results. The filing included certifications by defendants G. Thornburg, Goldstone, and Simmons, who each signed identical certifications in their capacities as the Company's CEO, COO and CFO. The certifications of G. Thornburg and of the other officer defendants similarly stated, in part:

I, Garrett Thornburg, certify that:

1. I have reviewed this report on Form 10-Q of Thornburg Mortgage, Inc.;

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4. The registrant's other certifying officers and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange

Act Rules 13a-15(f) and 15d-15(f))for the registrant and have:

a) designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

b) designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under

our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

c) evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

d) disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officers and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent function):

a) all significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

b) any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

*** 

19.    On July 19, 2007, after market close, Defendants issued a press release entitled, "Thornburg Mortgage Reports 2Q EPS of $0.66, Declares $0.68 2Q Dividend - Company's Disciplined and Efficient Strategies Increase Earnings Momentum in the Second Quarter; Continued Exceptional Credit Performance Contributes to Second Quarter Success -- Quarterly dividend maintained at $0.68 per common share -- Margins improved as returns on new mortgage assets improved and prepayment expectations slowed as interest rates increased -- 2Q mortgage originations of $1.7 billion, up 21% year-over-year -- Total assets of $57.5 billion; a 15% increase year-over-year -- Continued exceptional credit performance with 0.21% 60-plus day delinquencies and REO, well below the 2.32% industry average." The press release stated in part:

Thornburg Mortgage, Inc. (NYSE: TMA) reported net income before preferred stock dividends for the quarter ended June 30, 2007 of $83.4 million, or $0.66 per common share, as compared to $69.7 million, or $0.61 per common share for the same period in the prior year. Taxable earnings for the quarter are estimated to be $0.65 per common share.

Simultaneous with the earnings announcement, the company's Board of Directors declared a second quarter dividend of $0.68 per common share, payable on August 15, 2007 to shareholders of record on August 3, 2007. The ex-dividend date is August 1, 2007. This dividend is unchanged from both the year-earlier period and the first quarter of 2007. After payment of the second quarter dividend, we will have an estimated $0.05 per share of undistributed taxable income to support the dividend in the future. The $0.06 per share decrease in undistributed taxable income from the prior quarter is a result of the current quarter's dividend exceeding the current quarter's taxable earnings by $0.03 per share and an increase in the number of common shares outstanding which also had an impact of $0.03 per share.

*Garrett Thornburg,* the company's chairman and chief executive officer, remarked, "The second quarter continued the strong earnings trend that we set in the first quarter. For the second quarter in a row, our earnings were above consensus estimates on the strength of improved margins. *And, despite all the headline news regarding credit problems in the mortgage lending industry, the credit performance of our prime quality mortgage loan portfolio remained exceptional because of our unwavering focus on high quality lending practices.* As a result, our second quarter earnings remained solid and we maintained our dividend at $0.68 per common share."

*Larry Goldstone,* the company's president and chief operating officer, remarked, "Our earnings results in the second quarter benefited from a combination of factors including our utilization of new capital and additional financing strategies, slower mortgage prepayment expectations, improved profitability on new mortgage asset acquisitions and continued exceptional credit performance, which provided the foundation for another successful quarter at Thornburg Mortgage. During the quarter, we completed another collateralized mortgage debt transaction through which we permanently financed $1.3 billion of ARM loans. Because of the reduced capital requirement related to such transactions, we were able to employ $91.9 million of freed-up capital to support the acquisition of $1.0 billion in additional ARM assets. At June 30, 2007, the balance of our collateralized mortgage debt financing had reached $19.3 billion, accounting for 35% of our balance sheet financing, which we expect will continue to contribute to our earnings in future quarters."

Mr. Goldstone added, "A relatively strong common stock price during the second quarter allowed us to opportunistically issue new common equity through our diverse capital-raising programs. We received net proceeds of $189.0 million from these equity issuances at an average net price of $26.12 per share. These issuances are a powerful tool to

- 12 -

increase book value and earnings given we issued these shares at 1.3x our book value."

"We issued a new 7.50% Series E Cumulative Convertible Redeemable Preferred Stock at $25.00 per share. From this new issuance, we received net proceeds of $71.2 million at an average net price of $24.08 per share. When combined with additional issuances of our Series C preferred stock, we received net proceeds of $82.4 million at an average net price of $24.16 per share from total preferred stock issuances. These common and preferred issuances provide another avenue to enhance earnings for common shareholders, strengthen our balance sheet and achieve financing diversification. By successfully executing a number of financing and alternative capital-raising transactions, we enhanced our earnings prospects and strengthened our balance sheet in an environment where our core spread-lending business has been stressed by competitive market and interest rate pressures."

Mr. Goldstone continued, "Additionally, our portfolio yields in the second quarter benefited from wider spreads on new mortgage asset acquisitions caused by credit concerns within the mortgage industry and from reduced premium amortization as the rising interest rate environment during the quarter led to continued slow prepayments and slower projected prepayments going forward. Premium amortization during the second quarter was a $7.3 million benefit, compared to $22.2 million in premium amortization expense in the second quarter of 2006. Going forward, and based on the current level of prepayment rates, yield curve shape and the improved market for new ARM assets, we anticipate that our portfolio margin and earnings should continue to benefit from better spreads. We further expect that premium amortization expense will return to a range of $5 million to $10 million per quarter provided interest rates remain at the current level."

*Mr. Goldstone* continued, "The credit quality of the company's originated and bulk purchased loans remains exceptional. At June 30, 2007, the company's 60-plus day delinquent loans and REO properties were 0.21% of its $24.7 billion portfolio of securitized and unsecuritized loans, up from 0.11% at March 31, 2007, but still significantly below the comparable industry conventional prime ARM loan 60-plus day delinquency and REO ratio of 2.32%. We increased our loan loss provision for the quarter by $1.4 million. Management believes the resulting allowance for loan losses of $15.7 million at June 30, 2007 is an appropriate allowance level given the high-quality characteristics of the company's loan portfolio. Our portfolio has an average LTV of 67%, which we believe is indicative of our capacity to work out seriously delinquent loans and REO properties without incurring significant losses. *We continue to monitor performance in various geographic markets and continue to believe our portfolio is geographically well diversified and not unduly subject to any individual market stresses."*

Mr. Goldstone added, "The company recorded its first charge-off in 22 quarters. Although we have not realized any losses, we do expect to ultimately have losses on 9 REO properties based on current appraisals and estimated expenses of disposition. Accordingly, we have reclassified $2.4 million of loans to other assets and recorded $449 thousand in

- 13 -

charge-offs to reduce the carrying value of the reclassified REO properties to their net realizable value of $1.9 million. The charge-off does not flow through the income statement as it is taken from the general loan loss reserve. The general reserve is then replenished through the provision for loan losses which does flow through income and which totaled $1.4 million during the second quarter versus $0.9 million in the first quarter."

Mr. Goldstone concluded, "Adding to our positive outlook is the anticipated earnings benefit we should realize as the interest rates on approximately $5.7 billion of our hybrid ARMs contractually reset over the next 18 months from an average interest rate of 4.68% to a current market rate. As these seasoned hybrid ARM assets either reprice, refinance or pay off, our earnings will improve as we are funding many of these assets at negative portfolio margins today. *Taking all of these factors together, we are reiterating our belief that our earnings for 2007 will exceed the high end of the range of the current analysts' earnings estimates as polled by First Call, which are between $2.13 and $2.52 per common share. Further, it appears increasingly likely that our earnings in 2008 will exceed the current annual common dividend level of $2.72.*"

Origination Activity

Commenting on the mortgage origination program, Joseph Badal, senior executive vice president and chief lending officer, said, "Loan originations totaled $1.7 billion in the second quarter, an increase of 21% over the year-ago period. For the six months ended June 30, 2007, we closed $3.5 billion in loans, up 21% from the same period last year. Our results sharply contrast with the current Mortgage Bankers Association's (MBA) projection that the industry's overall origination activity in 2007 will drop by 9%. Our origination volumes are expected to remain strong with $831.5 million of loans in the fallout-adjusted pipeline at June 30, 2007, most of which we expect will close in the third quarter of 2007."

Mr. Badal added, "While the MBA is projecting a 9% decline in total mortgage originations in 2007, we anticipate that our service-oriented, common-sense approach to loan underwriting - with our focus on providing jumbo and super-jumbo ARM loans to borrowers with superior credit - will allow us to continue to gain market share. Further, recent credit problems in the mortgage lending industry are resulting in tighter credit lending practices industry-wide, which we believe will improve our relative competitive position as we sustain our high-level lending standards while most other lenders have to tighten their standards. In 2007, we anticipate that our innovative lending activities and improved competitive position will allow us to expand our lending partner network and grow our client base. Our goal is to originate $6.8 billion in mortgage loans in 2007, a 21% increase over 2006."

Mr. Badal explained, "During the quarter, the number of our correspondent lending partners grew by 5% to 313 relationships. Our average correspondent loan size of approximately $984,000 for loans originated in the first half of 2007 was over five times the national average, and up 22% year-over-year, while the credit characteristics of those loans have remained consistent with the superior quality of our loan

portfolio. Based on the latest mortgage origination statistics, we are the nation's 18th largest correspondent lender."

Mr. Badal continued, "Our recently launched wholesale channel continues to gain momentum owing to our ability to provide innovative products and exceptional service to the mortgage broker community. We now have twenty-one account executives in five targeted geographic regions supporting 475 brokerage firms. We continue to believe this channel will provide a growing source of higher yielding loans and new customer relationships. In 2007, we anticipate that 25% of our loan origination activity will be generated by this channel."

Mr. Badal concluded, "We have also seen positive results with our retention and referral programs. Not only has our client base grown 31% over the last year - we now service $13.9 billion of loans for 22,044 customers nationwide, but our Thornburg Mortgage Exchange Program(SM) and Refuse to Lose(SM) campaign have had a positive impact on our direct retail production and retention of current customers. These proactive campaigns target our borrowers who are likely to enter into another mortgage transaction and offer convenient mortgage options to allow us to retain and grow our lending relationships with them. In the second quarter, we exchanged $187.6 million worth of loans, thereby continuing our relationship with 324 customers, and in the first half of 2007, we exchanged $362.7 million of loans thereby continuing our lending relationship with 598 of our current customers."

Second Quarter Results

In the second quarter, net income earned before preferred stock dividends was $83.4 million, up 20% from $69.7 million in the year ago period. Net interest income was $102.3 million compared to $80.2 million, or 27% greater than the year ago period. Return on equity for the second quarter was 13.9% compared to 11.6% for the year ago period. Operating expenses as a percentage of assets remained low, 0.19% for the second quarter and the six month period ending June 30, 2007. This was an improvement of 0.02% over the same six month period in 2006, which also helped support current earnings. On a GAAP basis, book value was $19.38 per share, up $0.62 over the end of the first quarter. However, book value declined 9% from $21.27 per share from the year ago period, principally as a result of the change in Accumulated Other Comprehensive Loss on a year-over-year basis. The reason for the decline in book value is partially explained by the disproportionate amount of assets and hedging transactions whose market values are reflected in Other Comprehensive Loss as well as the impact of widening spreads on mortgage assets relative to our Hedging Instruments and funding costs.

The portfolio yield during the second quarter increased to 5.57% from 5.43% in the prior quarter. The company's average cost of funds increased to 5.00% in the second quarter from 4.93% in the prior quarter. This resulted in an average portfolio margin of 0.75% for the quarter, which was up from 0.68% from the prior quarter. There was premium amortization benefit for the quarter of $7.3 million versus premium amortization expense of $7.9 million in the prior quarter and premium amortization expense of $22.2 million for the second quarter of 2006. As

- 15 -

mentioned earlier, prepayment speeds continued to be slower than expected during the quarter and the company reduced its expectation of prepayments for the next two months to reflect continued slow prepayment activity. Further, the increase in interest rates during the second quarter resulted in a reduced expectation for prepayments in the future, further contributing to the premium amortization benefit in the quarter. The company continues to see a greater percentage of the hybrid ARM assets surviving the fixed rate period than originally forecasted, suggesting that the amortization methodology remains conservative. It should also be noted that should interest rates remain stable at current levels, premium amortization will likely return to a rate of $5 million to $10 million per quarter. For the quarter ended June 30, 2007, the quarterly Constant Prepayment Rate (CPR) averaged 17.0% CPR before considering modifications, up slightly from 15.0% CPR in the previous quarter and 15.0% CPR in the year ago period. The average CPR projected over the remaining life of the portfolio was 23.5% as of June 30, 2007, down from 25.5% as of March 31, 2007.

Clarence Simmons, senior executive vice president and chief financial officer, commented, "Our earnings also benefited from two additional factors in the second quarter. First, we sold $312.8 million of higher premium adjustable-rate mortgage-backed securities for a gain of $308 thousand. Additionally, strong loan origination activity resulted in a $1.6 million market value gain on our pipeline of mortgage loan commitments and offsetting pipeline hedging transactions due to the effective management of our mortgage loan pipeline."

Mr. Simmons continued, "We continue to manage our portfolio in order to protect ourselves from a possible resumption of short-term interest rate increases by the Federal Reserve or a rise in longer term interest rates should the yield curve steepen further. Accordingly, the addition of $3.0 billion of net new swap agreements and a $3.2 billion reduction of forward starting swap agreements in conjunction with the changes in interest rates experienced in the second quarter adjusted our portfolio duration at quarter end to one and a half months from negative two months at March 31, 2007."

Mr. Simmons concluded, "During the quarter, we acquired or originated $6.2 billion of new mortgage assets and generated $2.9 billion of net portfolio growth, ending the quarter with consolidated assets of $57.5 billion. At quarter end, the unamortized cost basis at which we held our ARM assets was 100.77%, up from 100.75% in the prior quarter, and still favorably positioning our asset portfolio should refinance activity pick up."

The company remains committed to preserving strong asset quality. As of the end of the second quarter, none of the securities in the company's portfolio have been downgraded since acquisition. To the contrary, 22 securities in the portfolio were upgraded from the original rating as a result of increased subordination due to prepayments within the respective collateral pools. At June 30, 2007, ARM assets rated "AAA" or "AA" comprised 94.6% of the ARM portfolio. AAA- and AA-rated purchased ARM securities represented 44.9% of ARM assets. Another 39.1% of ARM assets were "A quality" loans that the company has

securitized into AAA- or AA-rated securities. Purchased securitized loans, which represent securitizations in which the company has purchased all principal classes of the securitizations from third parties, comprised 10.6% of ARM assets. The company has retained the credit risk associated with the ownership of these purchased securitized loans and has an allowance for loan losses in the form of a non-accretable discount of $15.1 million, or 0.24% of the balance of these securities.

***

20.    As a result of the news of July 19, 2007, the price of Thornburg mortgage stock climbed 6% or $1.66, closing on July 20, 2007 at $27.19 per share on July 20, 2007, on heavy trading volume.

21.    Following this, on August 8, 2007, days before the investment community learned of the adverse financial conditions at Thornburg Mortgage, defendants filed SEC Form 10-Q for the quarter ended June 30, 2007, which included the previously reported financial results. The filing included certifications by Defendants G. Thornburg, Goldstone, and Simmons, who each signed identical certifications, in their capacities as the Company's CEO, COO and CFO. The certifications of G. Thornburg and of the other officer Defendants similarly stated, in part:

I, Garrett Thornburg, certify that:

1. I have reviewed this report on Form 10-Q of Thornburg Mortgage, Inc.;

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4. The registrant's other certifying officers and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange

Act Rules 13a-15(f) and 15d-15(f))for the registrant and have:

- 17 -

a) designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

b) designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

c) evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

d) disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officers and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent function):

a) all significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

b) any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

\*\*\*

22.     Defendants' statements as contained in ¶¶14-21 above were false and misleading. Amongst other things, Defendants' public disclosures served to actively conceal materially false and misleading statements which misrepresented and otherwise failed to disclose that:

(a)    the Company's repeated claims that its "unique approach to loan originations," affluent lender clientele and lending channels would not protect the business from market forces ravaging the mortgage lending business;

(b)    despite representations to the contrary, the Company's financial position had deteriorated to the point where it faced increasing margin calls;

(c)    despite representations to the contrary, the Company's financial leveraging capacity and capabilities were adversely impacted;

(d)    the Company's financial situation had deteriorated to the point where it was forced to sell certain assets; and

(e)    as a direct result, Thornburg Mortgage reported flawed, defective and materially overstated financial results, making it impossible for the investment community to determine the Company's business prospects in present and future quarters.

## THE TRUTH UNFOLDS

23.    Beginning on August 10, 2007, without any advance warning from the Company, the major credit rating agencies began to downgrade debt instruments issued by Thornburg Mortgage. On August 10, 2007, Moody's Investor Service disclosed major and adverse funding and valuation volatility at Thornburg Mortgage. As a result, Moody's downgraded the Company's senior unsecured debt to a "Ba3" rating and its preferred stock to a "B2" rating, indicating that further downgrades were possible.

24.    Also on August 10, 2007, Standard & Poor's similarly lowered its ratings of Thornburg Mortgage securities and lowered the Company's long-term credit rating to "B" from "BB." As Standard & Poor's placed the Company on CreditWatch Negative, S&P credit analyst Adam Rosengarten commented that, "[w]hile the company's balance sheet is comprised of high-quality assets, dislocation in pricing of all mortgage assets has

restricted Thornburg's access to repo funding, and the company is facing increasing margin calls."

25.     On the news of August 10, 2007, the price of Thornburg Mortgage stock tumbled $3.17, closing at $18.06 per share. Despite the adverse news, defendants endeavored to conceal the truth, stating only that "irrational sentiment" was at work in the secondary mortgage markets. In a response that served to create further confusion, the Company announced that it would cease accepting requests for mortgage rate lock-ins for a four day period, beginning on August 14, 2007.

26.     Then, on August 14, 2007, investment analysts, including RBC Capital Markets, Piper Jaffray, Credit Suisse, Jefferies & Co., and Friedman Billings Ramsey quickly moved to downgrade Thornburg Mortgage. On August 14, 2007, analysts at Jeffries wrote that "[w]e believe that margin calls exacerbated by decreased available leverage is forcing asset sales," and that, "[i]n addition, with Thornburg's stock trading at a substantial discount to book value, we believe the company has no opportunity to raise permanent capital to stem the tide."

27.     Amidst rumors of serious business issues and a halt in trading of Thornburg Mortgage stock, on August 14, 2007, Defendants shocked the market with a press release entitled, "Thornburg Mortgage Announces Change of Second Quarter Dividend Payment Date to September 17." The press release stated in part:

> SANTA FE, N.M.--(BUSINESS WIRE)--Aug. 14, 2007--Thornburg Mortgage, Inc. (NYSE: TMA), a leading single-family prime residential mortgage lender focused principally on the jumbo segment of the adjustable rate mortgage market, *announced today that its Board of Directors has rescheduled the payment date of the company's second quarter common dividend of $0.68 per share to September 17, 2007.* By September 17, the company will receive its scheduled monthly mortgage payments for August and will have had more opportunity to manage through this difficult environment. The dividend was originally scheduled to be paid on August 15, 2007 to shareholders of record on August 3, 2007, as previously noted in the company's second quarter earnings announcement on July 19, 2007.

- 20 -

The Board of Directors said it took this action in response to significant disruptions in the mortgage market which resulted in the sudden and unprecedented decline in the market prices of its AAA-rated mortgage securities that began on August 9, 2007 and subsequent increase in margin calls related to its repurchase agreement financings on those securities. There have also been disruptions in the company's ability to fund its mortgage assets in the commercial paper and the asset-backed securities markets. To date, the company has successfully met all of its commercial paper obligations. Finally, the company has also experienced delays in its ability to fund mortgage loans to its lending partners.

Commenting on the Board's decision, *Larry Goldstone, the company's president and chief operating officer, said, "After extensive deliberation, and acknowledging the severity of the situation, the Board determined that the best way to preserve shareholder value in the near term and grow it over time is to retain our cash to enhance our ability to work with our lenders and weather this tumultuous environment. We will continue to monitor the situation."*

Mr. Goldstone continued, "After careful analysis of the current value of our mortgage securities portfolio, we believe that our book value, which includes recent changes in the market value of our mortgage securities and liabilities is $14.28 per share as of August 13, 2007 versus $19.38 per share as of June 30, 2007. The majority of that book value decline has occurred over the past week, and is not a reflection of a change in the credit quality of our mortgage assets. As such, and barring substantial additional decline in the market value of mortgage-backed securities, we will continue to originate and invest in high-quality mortgage assets once we get through this environment. While this market event represents a disappointing setback for us and our shareholders, we will rebuild when the environment stabilizes."

\*\*\*

28.    Following the shocking press release of August 14, 2007, shares of Thornburg Mortgage stock tumbled $6.67 or 46.7%, closing at $7.61 on volume of 27.2 million shares, for an instant loss of $805 million in market capitalization.

29.    On August 20, 2007, the Company issued a press release entitled, "Thornburg Mortgage Stabilizes Its Financing Platform and Plans to Return to Business as Usual - Rapid Sale of $20.5 Billion of Assets Underscores Company's Highly Liquid Portfolio - Substantial Reduction in Repurchase Borrowings Greatly Reduces Exposure to Margin Calls - Credit Quality Remains Among the Industry's Best - 2Q Common Dividend of $0.68 on Schedule for September 17 Distribution." The press release, which addressed all of the previously revealed issues facing the stock, stated in part:

- 21 -

SANTA FE, N.M.--(BUSINESS WIRE)--Aug. 20, 2007--Thornburg Mortgage, Inc. (NYSE:TMA), a leading single-family prime residential mortgage lender focused principally on the jumbo segment of the adjustable-rate mortgage (ARM) market, *announced today the sale of a substantial portion of its AAA-rated mortgage securities portfolio and a significant reduction in its borrowings portfolio.* The company took these actions to address challenges in meeting its liquidity and financing needs caused by rapidly declining mortgage securities prices and simultaneous declines in the value of its hedging instruments. These rapid declines negatively impacted the company's ability to continue to support its borrowings collateralized by its high quality mortgage securities portfolio.

As a result of these unprecedented conditions in the mortgage financing market, *Thornburg Mortgage undertook the following aggressive portfolio management actions over the past six business days:*

the sale of approximately $20.5 billion of primarily AAA-rated MBS (mortgage-backed securities), underscoring the salability of the company's high credit quality portfolio;

the sale resulted in the reduction of its mortgage asset portfolio from $56.4 billion at June 30, 2007 to approximately $36.4 billion at August 17, 2007; its reverse repurchase and commercial paper borrowings from $32.9 billion at June 30, 2007 to approximately $12.4 billion at August 17, 2007; and its future exposure to margin calls on its short-term borrowings;

the termination of approximately $41.1 billion of interest rate hedging instruments, thereby reducing the company's exposure to market value changes related to its hedging portfolio.

Because of these actions to stabilize the company's ability to meet its financing obligations and continue its mortgage portfolio lending operation, the company estimates it will realize an approximate capital loss of $930 million as a result of mortgage securities sales for the quarter ending September 30, 2007. Of this total, $700 million was already reflected as an accumulated comprehensive loss on the company's consolidated balance sheet at June 30, 2007. Further, as a result of the termination of its interest rate hedging instruments, the company realized a net gain of approximately $40 million, the majority of which will be capitalized and realized over the remaining life of those hedging instruments as required by FAS133.

In light of the dramatic reduction in the company's mortgage portfolio over the past week, the company is not yet prepared to offer earnings or dividend guidance regarding the amount of any future dividends beyond the September 17, 2007 distribution that has already been declared. However, the company did sell most of its lowest yielding and negative spread assets as part of these asset sales and expects to remain profitable on an operating basis in the third quarter. Further, the company believes that mortgage yields have improved to at least 1.25%

over its cost of funding new mortgage assets, which indicates an expected improvement in its portfolio margin going forward as compared to its reported margins over the past year. Finally, the company is not yet in a position to comment on any additional tax implications of these portfolio actions.

The company's GAAP book value, which includes recent changes in the market value of its mortgage securities portfolio and hedging instruments, continued to decline over the course of the previous week as mortgage market conditions continued to deteriorate and as actual mortgage securities sales were completed by the company. *The company's GAAP book value is estimated to be $12.40 as of August 17, 2007, which includes an estimated unrealized market value loss of $2.42 per share as reflected as an accumulated comprehensive loss, compared to $14.28 per share estimate as of August 13, 2007, and $19.38 per share estimate as of June 30, 2007.* The further decline in book value is reflective of the continued mortgage market deterioration as well as the market impact of the aggressive sale activities of the company in recent days, not a change in the credit quality of the company's mortgage assets. At present, 93.7% of the company's real estate assets are rated AA or AAA and its 60-day plus delinquent loans increased by only 2 basis points between June 30 and July 31, to 0.23% from 0.21% -- or 79 delinquent loans out of approximately 38,000 loans in its portfolio -- as compared to the national average of 2.32% as of March 31, 2007 as reported by the Mortgage Bankers Association for prime adjustable rate mortgage originators.

\*\*\*

30.    During the Class Period, Defendants knew and concealed the fact that:

(a)    the Company's repeated claims that its "unique approach to loan originations," affluent lender clientele and lending channels would not protect the business from market forces ravaging the mortgage lending business;

(b)    despite representations to the contrary, the Company's financial position had deteriorated to the point where it faced increasing margin calls;

(c)    despite representations to the contrary, the Company's financial leveraging capacity and capabilities were adversely impacted;

(d)    the Company's financial situation had deteriorated to the point where it was forced to sell certain assets; and

(e)    as a direct result, Thornburg Mortgage reported flawed, defective and materially overstated financial results, making it impossible for the investment

community to determine the Company's business prospects in present and future quarters.

## LOSS CAUSATION/ECONOMIC DAMAGES

31.     Defendants' false and misleading statements and omissions had the intended effect and caused Thornburg Mortgage stock to trade at artificially inflated levels throughout the Class Period, reaching an intermediate high of $28.11 on June 4, 2007. Following this, on August 14, 2007, the price of Thornburg Mortgage stock fell to $7.61 per share, an instant decline of 46.7% in the value of Thornburg Mortgage shares.

32.     The decline in the price of Thornburg Mortgage stock on August 14, 2007 was the direct result of the unraveling and disclosure of the nature and extent of Defendants' fraud as the truth finally leaked into and was absorbed by the market. The timing and magnitude of the Thornburg Mortgage stock price declines negate any inference that the loss suffered by Plaintiff and other Class members was caused by changed market conditions, macroeconomic or industry factors or Company-specific facts unrelated to the Defendants' fraudulent conduct.

## APPLICABILITY OF PRESUMPTION OF RELIANCE
## FRAUD-ON-THE-MARKET DOCTRINE

33.     At all relevant times, the market for Thornburg Mortgage was an efficient market, for the following reasons, among others:

(a)     Thornburg Mortgage met the requirements for listing, and was listed and actively traded on the NYSE, a highly efficient and automated market;

(b)     As a regulated issuer, Defendants filed periodic public reports with the SEC; and

(c)     Defendants regularly communicated with public investors via established market communication mechanisms, including regular disseminations of press releases on the national circuits of major newswire services and other wide-ranging

public disclosures, such as communications with the financial press and other similar reporting services.

34.     As a result of the foregoing, the market for the securities of Thornburg Mortgage promptly digested current information regarding Thornburg Mortgage from all publicly available sources and reflected such information in stock prices of Thornburg Mortgage.   Under these circumstances, all persons who purchased or acquired the securities of Thornburg Mortgage during the Class Period suffered similar injury through their purchase of the aforementioned securities at artificially inflated prices and a presumption of reliance applies.

## NO SAFE HARBOR

35.     The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this complaint. Many of the specific statements pleaded herein were not identified as "forward-looking statements" when made. To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the particular speaker knew that the particular forward-looking statement was false, and/or the forward-looking statement was authorized and/or approved by executive officer(s) of Defendants who knew that those statements were false when made.

## CLASS ACTION ALLEGATIONS

36.    Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of all persons who purchased Thornburg Mortgage publicly traded securities on the open market during the Class Period (the "Class"). Excluded from the Class are Defendants.

37.    The members of the Class are so numerous that joinder of all members is impracticable.  The disposition of their claims in a class action will provide substantial benefits to the parties and the Court.  Thornburg Mortgage had more than 120 million shares of stock outstanding, owned by thousands of persons.

38.    There is a well-defined community of interest in the questions of law and fact involved in this case.  Questions of law and fact common to the members of the Class which predominate over questions which may affect individual Class members include:

(a)    Whether the Exchange Act was violated by Defendants;

(b)    Whether Defendants misrepresented material facts;

(c)    Whether Defendants' statements omitted material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading;

(d)    Whether Defendants knew or deliberately disregarded that their statements were false and misleading;

(e)    Whether the prices of Thornburg Mortgage publicly traded securities were artificially inflated; and

(f)    The extent of damage sustained by Class members and the appropriate measure of damages.

- 26 -

39.    Plaintiff's claims are typical of those of the Class because Plaintiff and the Class sustained damages from Defendants' wrongful conduct.

40.    Plaintiff will adequately protect the interests of the Class and has retained counsel who are experienced in class action securities litigation.  Plaintiff has no interests which conflict with those of the Class.

41.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

## COUNT I

### For Violation of §10(b) of the 1934 Act and Rule 10b 5
### Against All Defendants

42.    Plaintiff incorporates ¶¶1-41 by reference.

43.    During the Class Period, Defendants disseminated, approved or deliberately disregarded the false statements specified above, which they knew or should have known were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements, in light of the circumstances under which they were made, not misleading.

44.    Defendants violated §10(b) of the 1934 Act and Rule 10b-5 in that they:

    (a)    Employed devices, schemes, and artifices to defraud;

    (b)    Made untrue statements of material facts or omitted to state material facts necessary in order to make the statements, in light of the circumstances under which they were made, not misleading; or

    (c)    Engaged in acts, practices, and a course of business that operated as a fraud or deceit upon Plaintiff and others similarly situated in connection with their

purchases of publicly traded Thornburg Mortgage publicly traded securities during the Class Period.

45.    Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for Thornburg Mortgage publicly traded securities.  Plaintiff and the Class would not have purchased Thornburg Mortgage publicly traded securities at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by Defendants' misleading statements. When the truth was revealed, the artificial inflation in the price of the stock purchased by Plaintiff and the Class was removed, and Plaintiff and the Class suffered losses.

46.    As a direct and proximate result of these Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their purchases of Thornburg Mortgage publicly traded securities during the Class Period.

## COUNT II

### For Violation of §20(a) of the 1934 Act

### Against All Defendants

47.    Plaintiff incorporates ¶¶1-46 by reference.

48.    The Individual Defendants acted as controlling persons of Thornburg Mortgage within the meaning of §20(a) of the Exchange Act.  By reason of their positions as officers and/or directors of Thornburg Mortgage, the Individual Defendants had the power and authority to cause Thornburg Mortgage to engage in the wrongful conduct complained of herein.  By reason of such conduct, the Individual Defendants and Thornburg Mortgage are liable pursuant to §20(a) of the Exchange Act.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment as follows:

    A.    Declaring this action to be a proper class action pursuant to Fed.R.C.P. 23;

    B.    Awarding Plaintiff and the members of the Class compensatory damages;

    C.    Awarding Plaintiff and other members of the Class pre-judgment and post-judgment interest, as well as reasonable attorneys' fees, expert witness fees, and other costs and disbursements;

    D.    Awarding Plaintiff and other members of the Class any other relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiff hereby demands a trial by jury on all causes of action so triable.

DATED:        September 18, 2007

                                            Respectfully submitted,


                                            SCOTT + SCOTT, LLP
                                            David R. Scott
                                            108 Norwich Avenue
                                            P. O. Box 192
                                            Colchester, CT  06415
                                            Telephone:  (860) 537-5537
                                            Facsimile:  (860) 537-4432

                                            SCOTT + SCOTT, LLP
                                            Arthur Shingler, III
                                            600 B Street Suite 1500
                                            San Diego, CA  92101
                                            Telephone:  (619) 233-4565
                                            Facsimile:  (610) 233-0508


                                            Counsel for Plaintiff

## PLAINTIFF CERTIFICATION PURSUANT TO
## FEDERAL SECURITIES LAWS

Donald Smith, ("Plaintiff"), declares. as to the claims asserted under the federal securities laws, that:

1.     Plaintiff has reviewed the Complaint and retains Scott + Scott, LLP and such co-counsel it deems appropriate to associate with to pursue such action on a contingent fee basis.

2.     Plaintiff did not purchase the security that is the subject of this action at the direction of Plaintiffs counsel, or in order to participate in any private action.

3.     Plaintiff is willing to serve as a representative party on behalf of the class, including providing testimony at deposition and trial, if necessary.

4.     Plaintiffs transaction(s) in the **Thornnbug Mortgage Inc. FINANCIAL TRUST (TMA)** security that is the subject of this action during the Class Period is/are as follows:

| No. of Shares | Buy/Sell | Date | Price Per Share |
|---|---|---|---|
| 200 | B | 5/12/06 | $27.25 |
| 200 | B | 5/23/07 | $27.00 |
| 200 | B | 06/08/07 | $26.91 |
| 200 | B | 7/21/07 | $24.92 |
| 100 | B | 7/2506 | $25.06 |
| 200 | B | 7/27/07 | $25.00 |
| 100 | B | 8/03/07 | 24.49 |
| 500 | B | 9/21/06 | 25.059 |
| 500 | B | 9/21/06 | 24.89 |
| 300 | B | 4/26/07 | 27.93 |

5.     During the three years prior to the date of this Certification, Plaintiff has never served, nor sought to serve, as a class representative in a federal securities fraud case.

6.     Plaintiff will not accept any payment for serving as a representative party on behalf of the class beyond the Plaintiffs pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as ordered or approved by the Court.

I declare under penalty of perjury that the foregoing is true and correct. Executed this 24 day of , August, 2007, at Savannah, GA (city, state).

Your Printed Name:  Donald T. Smith

Mailing Address:    2 Wildgoose Lane, Savannah, GA 31411

Telephone number:  912-598-1351

E-mail address:    seasmith2@bellsouth.net